Final case in our call this morning is agenda number 21, case number 107658, Jennifer Keener v. City of Herrin Good morning, Your Honor. May I please the Court, Mr. Prance? My name is Joe Blier. I'm here representing the City of Herrin in this appeal before this case is a very simple issue, and the issue is such, does 10-202 trump 10-401? And I believe that this, it's our position that 202 does not trump 107, and I support that our position by the previous decisions in this court by the Honorable Carmeier, Justice Carmeier in the DeSmet case, and the Honorable Justice Garmon in the Lacey case. The facts in this particular case occurred when the Herrin police officer, Quint Laird, the sergeant at the time, received a call around 3.30 a.m. of a dispute between a young man and a young woman. He arrived at the scene and located the decedent in the rear of a vehicle, and there was a male suspect also. There was two police officers. The energy police officer took the male suspect and took him to the energy police department, which is separate from the Herrin police department, and Officer Laird took Miss Keener to the Herrin police department, and she was taken into custody at that time on a citation for underage consumption. But she was 18 years of age. While she was not legal to drink, she was a legal adult. She posted bond and was released from custody. She was allowed to leave the locked confinement of the police department and was allowed to go into the lobby, and she was released from custody of the Herrin police department. And I believe that is the issue that is the telling point in this particular case on 107 when it says that a police officer or a municipality cannot be liable for injuries caused by the failure to make the arrest or releasing a person from custody. Was there any paperwork or any other tasks that remained to be done with regard to this young woman? No, Your Honor. I'm sorry. When she went into the waiting room? No, Your Honor. She had posted her I-bond. She was 18 years of age, so she was an adult for bond posting. She posted the bond, and she was allowed outside the locked doors of the police department into the lobby, with the understanding that someone was coming to get her at the time. And then she, for whatever reason we don't know, she left the police department. I think that's important. After she was released from custody, she left the police department. She walked, maybe not in the record, but it was about .7 miles, about 10 blocks from the police department, and was struck by a vehicle. It was a hit and run at the time. I think that's important because at that point the Herrin police department had released her from the police station, and at that point where this action took place, the police department was not exerting any control over the situation on her, on the scene, on the roadway, or had no control over the situation at the scene of where this accident happened some 10 blocks from the police department after her release. I believe that part of the plaintiff's argument is that the release was conditioned upon the young lady having an adult come and pick her up. Does the record disclose whether that is part of the I bond or whether that was something else? Your Honor, the record was supplemented by the deposition of Mr. Quentin Laird, the police officer, and his bond was to give her an I bond. As a matter of fact, I think the record says she had $100 cash, and he could have even taken the $100 cash and taken all the money she had or give her an I bond and allowed her, and then she called and had someone get him. But no, the answer to your question is there is nothing in the record that the bond was conditioned on someone picking her up, and I don't believe the law would allow someone. It's a bondable offense, a petty offense that requires a bond, and I don't believe you can condition the bond on anything other than the posting of the monetary sum. Mr. Blair, you started by saying how simple this was to you. Yes. It's just a case of whether she was released from custody. If she was, 4107 applied, it's the most specific, and immunity is granted. Is that basically it? That's about as simple. Is it that simple? I believe it is, Your Honor. I believe it's that simple. And I think, you know, this Court here has taken a number of these cases where they talk about the specifics of the tort immunity, Lacey and DeSmit and others, and I believe that the legislature and all those, Justice Carmeier discussed and Justice Carmeier discussed, you know, the immunity set forth, it provides an immunity to police officers, and unless there is a specific exception within that section, you know, they can't, you can't broaden it, and if it's not mentioned either negligence or willful wanton, such as other statutes, this is an absolute immunity. And, Your Honor, if you take it one step further, and would it be as simple as it is, there's got to be some point in time to release a police officer's liability in a situation. I mean, if you don't cut off the police officer, I mean, if you say that, you know, the act continued past the release, when does the police officer eventually get let off the hook, so to speak, or his duty to the person or the detainee stopped if there's not some point in time where the police officer can release the person from custody and then extinguish the responsibility of what happens. And if you took it one step further, you know, is it the next, if it would happen the next day or the next day after that, when would the responsibility of the police officer. Counsel, if I may. Yes. You know, your argument is certainly a valid argument, but if we were to move, if we were against your expectations to move past that point and start an analysis of 202, 2202. Yes, sir. Would that statute in its language apply to this situation at all? Would 202 apply in this situation? Not disregarding what you've just said, but if we moved past that and said, no, I think we ought to look and see if 202 applies to this case, why should it or should it not apply? Your Honor, in response to that question, I think, and the fellow court kind of mentioned, I still think it's a simple issue, 107 applies, but. I understand that and understand the validity of that argument. I just recognize that 202 applies sometimes. I believe it did in this case. It did apply at the beginning, and I believe that, you know, there's no question that Officer Laird came to the situation and had control of the situation when he initially decided to take custody of the young lady, and I believe that an argument could be made that at that junction 202 would apply if something would have happened to her there at the scene or while she was still within the ability to be controlled by the officer. I think it would be a different situation, and I think that this court and we would have to address the issue on the 202, and I think 202 applied up to the point of when she is posted on and releases from custody. I think that the 107 cuts off the 202 approach after the officer gets to the situation where he has taken control of her, he diffused the situation, he took her to the police station to separate her from the, as a matter of fact, in his deposition, he separated her thinking that he could get a more true story of what was going on if she was not in the same presence with the male suspect that was there. And so to answer your question, I think that 202 would apply up to a point in the fact situation we have here, but in the allegations of the complaint and how this case played out, that 107 at the point that she's released stops 202. I think it's my position that 202 applied up until they decided she posted on and released and 107 takes over. It's a good explanation as to why you can't tell me why it doesn't apply. Why it doesn't apply? Why it didn't apply. It did apply up until the point she was released. That's my point. Okay. But, I mean, it's sort of like the Lacey decision. There's got to be a point at some time that you have to stop. I mean, you have to cut off the situation at some time, and I think 202, he's enforcing the law, he comes and takes over the control of the situation, diffuses the situation, writes a citation, enforces the law, and bonds her out. And at some point, the enforcement under 202 has to stop, and it goes on to the next. Back to Justice Carmire's question again, if it is a question. At some point, the young woman was allowed to make a phone call, not to her family, apparently, but to some other adult who told her on the phone that they were going to come and pick her up. That's correct. It was about an hour before she was released? Your Honor, I apologize. The time frame, I believe he came to the call originally at 3.30, I believe, was when the call was made. He came to the situation, and I think the record says she left about 4.40. And I apologize to the Court. I don't know specifically when in that time frame. I read the same things and just thought it was about an hour. Right. I agree with you. It was about an hour from when he received the call to this side street in Heron until she released. I think the record says she left at 4.40, so it's an hour. In the deposition, was there any talk about why she chose to leave before she was picked up? No, Your Honor. She was posted on and she was allowed to go into the lobby that's a public lobby, and the record says Sergeant Laird actually had another call. He had to respond to another. He finished that call and was sent off to another call while she was in the lobby for whatever reason. And to be honest about it, we don't know when she left, other than I guess you could backtrack how long it would take to walk the ten or so blocks that she'd walked. Thank you. How would you square the Court's decision in Doe v. Calumet City with Section 4107, which would immunize for an injury caused by failure to make an arrest, when you're relying on that section of the same statute, which refers to releasing a person in custody? If in Doe there was no immunity granted because the police had control of the situation and didn't make an arrest and do anything, how can you rely on the part that says releasing from custody still allows immunity for her? My first response to your question, Your Honor, would be the way you answered Doe in the Smed case. It's a very fact-specific case to the facts of that case while there was control. Secondly, Your Honor, as I attempted to answer the first question, I think 202 applies up to a point. Also, in that particular case, the officer was there, and I think the distinguishing point between the Doe case and this case is, unfortunately, the controlling officer, I think Officer Horka, H-O-R-K-A, he was there. He prevented anybody else from intervening. He prevented anybody else from going into the apartment. And there was, without question, he had control over the situation at that particular time. And I think in this particular case is distinguished from that, and 107 is distinguished from the police protection case in that case, is that at some point, once they take into custody, there's a point that has to come to where the situation is over and the person is released. Because if you don't allow some point to the person to get released, and I think that's how I reconciled Doe and the 107, I think that under Doe, it was the issue of, you know, the officer was there to be able to take control of the situation. Here, we had control of the situation. She was released and left on her own will and had the accident some blocks from the police department. I take it it's your position that Karen had no authority to hold her past the point she signed the IPA. That's correct, Your Honor. She's 18, and it's a petty offense. It's bondable, and I don't believe that we have the authority to hold her once she's able to postpone being an adult after that point. And how do you square that with Ozick and Fadegato, the DUI case? First of all, the Fadegato case, I read that all the parties in that particular case, and according to the opinion of the appellate court, both sides agreed that the officer at that time was, in fact, enforcing the law. And in that situation, that's when the husband was told to leave. The police officers were there. The wife and the husband were having this domestic dispute. The officers there were in control and told him to leave, and I think that that case is distinguishable on the fact that the officer there was in control. Both parties agreed that they were enforcing the law at that particular time, which took them out of the 107 because it didn't really release them from custody. And also the ORIK case, that was the first district, and that's the one where the person was stopped and had the DUI and they let him go. The first district appellate court, I think one was wrong in it because they relied upon, they basically said, all the case law from this court and the other courts post Doe were fundamentally flawed. And I think that those two particular cases are different from this case and that when the event happened, the police officer was allowed, he wasn't finished with his control of the situation in both those situations, such as we have here where the control finished and was released from custody after the police officer was there enforcing the law. Counsel, let me follow up on Justice Carmeier's questions, at least in part. This comes to us on a motion to dismiss, correct? Yes. And we take the facts, because you mentioned, and Smit, you had a look at the facts, all well-pledged allegations. And looking at at least count three in the complaint, it makes the allegation that when she was taken into custody, she was incoherent and legally intoxicated. It also says in paragraph six, referring to this phone call, that there was some agreement that an adult would come and retrieve her. And this is not clear to me, but it looks like they were still supervising actions by sitting with her in the lobby, but it doesn't explain at that point. If someone was supervising, and if we were to read this, that she's still publicly intoxicated, when Justice Carmeier asked, there was no authority, would there not be authority to keep someone who's presumably still publicly intoxicated in their control? Does that question make sense? Yes, that question makes sense. I'm trying to figure out an artful way to answer the question. You're correct, it's on the motion to dismiss, and you've got to take the facts and most likely favorable to the plaintiff in this situation. But the facts allege in the complaint that she was brought to the police station in an intoxicated state, he arrested her for that charge, and the criminal statute provides there's a petty offense, and then once she posts bond, I can't keep her. I do some civil rights defense. You know, once I know that once someone posted bond, I'm detaining that person after the bondable offense, which the criminal statute provides, I have really no authority to take control of her or keep her from there once she posts bond. Counsel, he preparely set her out on bond based upon some kind of general court order somewhere that permitted I-bonds to be set in the police station? Yes, Your Honor. Okay. He certainly had control of when he was going to issue the I-bond. That is correct. He certainly could have delayed it in the public safety interest of making certain this intoxicated person was safe. He could have done that. I don't disagree with you. He could have. You're correct. Officer Laird made the decision as to when to release her, and I think that's That's covered by 107. That's correct because it doesn't provide an exception that he's negligent, willful and wanton from when he decides to release her. Once he releases her from care, 107 provides the immunity. Mr. Plyer? Yes. Does that mean there's a duty written into 107 to keep someone who's intoxicated? Is there a duty from 107 to keep someone who's intoxicated? Can you read a duty in 107 just like Justice Fitzgerald said? If she was intoxicated and he had control of when to give an I-bond, is there some duty when somebody's in a state like that? I don't believe so. Presently, I believe that would be something up to the legislature to govern or make some law as to that. But I don't believe under the facts or under the law that under the Immunity Act, I don't believe we get to that point to whether or not the police officer has to make that decision whether or not to release them into custody at that moment. If there's no further questions, we thank you for this opportunity to speak to you, and we would ask that the counts three and four of the amended complaint be remanded or reversed and reversed to Fifth District. Thank you. Thank you. May it please the Court, my name is Mark Prince, and I represent the plaintiff appellant or appellee, Jennifer Keener, in her capacity as the administrator of the estate of Chelsea Keener. The first issue I would like to address is also in response to some of the questions from the bench, and that is whether there was a release from custody in the first place, whether 4107 is even implicated under these facts. Officer Laird, and the record is supplemented with his discovery deposition, testified very clearly that there was a condition placed on this I-bond that we've been discussing. The I-bond he was going to give to her on the condition that Chelsea call an adult to make arrangements for a sober person to come pick her up. That's why the call was placed to Linda Kincaid. Officer Laird testified he even talked to Linda Kincaid. He promised her that Chelsea would be waiting at the police station when she got there. The police station is in Heron. Linda Kincaid is coming from Harrisburg, which is about a 45-minute drive. So when this call came in and Officer Laird, who up until this second call came in, had decided to detain Chelsea until Linda Kincaid came to pick her up, he was exercising control over her situation. And it was only because this second call came in later that night that he had to respond to because the city police department was understaffed. There were only two officers on duty. He told her, I'm going to put you in the lobby, but you wait until your ride gets here. Let's go back to what you first said, Mr. Prince. Yes, sir. You said that the condition of the I-bond was that she would call and arrange for a ride. Correct. All right. Well, why, if that's the condition, the condition is met once the call is made, isn't it, and the I-bond is issued at that point? Or did he say, you are still in custody, you are sitting here until I see you get in that car, until she shows up, and then I'll issue the I-bond? I would assert that once she, it appears from what you're saying the condition was met. Are you saying it wasn't met? It wasn't met. And we can take that condition, we can extend it further, because the I-bond discussion took place earlier. It took place at two times, according to the deposition. Once when there was some discussion about posting a $100 bond, and Officer Laird said, basically, I'm going to try and be a nice guy and we can I-bond. But you've got to make arrangements for a ride. Then when the second call came in that he was dispatched to, and he had to leave and he escorted her to the lobby out of the secure area, the last words he said to her was, you're supposed to wait for your ride before you leave. And then I said, so in the deposition I said, well, Officer Laird, she's intoxicated at this point, right? Yes. He agrees. Yes, she is legally intoxicated. She blew .18, so she's two and a fourth times the legal limit. And I said, Officer, have you ever known an intoxicated person to tell you they're going to do one thing and then turn around and do something else? Yes. So I think the condition is actually she's got to wait until the adult sober driver comes to pick her up. So I can just – Counsel, was there an authority for him to have any control over her after the I-bond? Absolutely. As was alluded to earlier, there is authority for a police officer to take somebody into protective custody. Once she has an I-bond and released, even though he tells her don't go. I think he can still hold her in protective custody, as we discussed in our brief under the Alcoholism and Other Drug Dependency Act. That gives a police officer the right to take somebody into protective custody who's exhibiting symptoms of intoxication. I understand that, but he also gave her an I-bond and released her.  I mean, that is a dilemma. But as the city of Heron conceded in their argument, 2202 did apply at the beginning. And once you're executing and enforcing the law, you've got a duty to act in a non-wilful and wanton manner. And the facts are such – It grants immunity upon release of custody. Isn't the officer between a rock and a hard place here if they have to, as counsel said, and I didn't hear anything contrary, maybe there is something contrary, if counsel says that he was required, the officer was required to allow her to postpone, then went with the I-bond, once that release is made, the immunity applies. But, Your Honor, his actions are inconsistent with his words. He's, you know, they're taking the position that once the I-bond is posted, we have no right to detain her. But they were setting the stage – It's uncontradicted, and that's a good point. Once the I-bond is posted, it's uncontradicted, isn't it, that the paperwork in this case would indicate that the I-bond was posted prior? Or is that in dispute? I don't know the answer to that. I know what I can tell you for sure, from where we're at with the discovery, is that the booking process had been completed. She'd been fingerprinted, she'd been photographed, and all that necessary paperwork for that arrest had taken place. Now, whether the I-bond had actually been, I'm not sure what the procedure is and how that works, but whether that had been done, my presumption is that it probably had been done. Just with the way the circumstances played out that evening. And just in touching upon it, you mentioned the alcoholism act in response to Justice Burke's question. That's specifically been held to not exist for a private cause of action, right, at least in the one case determining that. That is correct. Marshall v. Ellison, I think, specifically held that it did not provide for a private right of action, but it still pronounces what the public policy is. It still gives the police officers the authority. It doesn't matter whether we have a private cause of action. They still have the authority. They have the right, even the obligation, to take somebody into protective custody to protect them, to protect that intoxicated person. I'll let you go after this one, Mr. Prince, but isn't the fact that there is an immunity for releasing a person in custody exactly the type of thing that's contemplated here, a negligent release of custody or a willful and wanton release of custody? And then the immunity is granted, saying when there is a release of custody, then the immunity just attaches, regardless of these overriding circumstances. And your position on being overriding? I don't think so, because I think at that point in time, the part of the analysis kicks in where we've got to look at the Doe and the DeSmet and the Lacey cases, which all, I think, uniformly recognize and reiterate that if an officer is executing and enforcing the law pursuant to 2.202, then that is almost, they call it an exception to 4.102 or 4.107. And I think so we come to that point in time. And you look at the Ozick case and the Fatigado case. Those were, in essence, releases. I mean, the city has taken the position that we've got to cut off officer liability at some point when they release somebody from custody. Okay? But you look at Fatigado and Ozick, there were drunk drivers. The police detained them. I think they issued citations on one and released them from any further custody. He said drive home. And watch them get into the car. Pardon me? And watch them get into the car. That is correct. And watch them drive away. Right. So is that distinguishable from this case in which I guess you're saying it's not? It is not, because they weren't present when the accident happened. The officers weren't present when the accident happened. They released them and let them go on their merry way. And they ended up killing other people. They let Chelsea Keener go. They still have a duty to refrain from acting with willful and wanton misconduct under 2202 because it's undisputed, I think, I hope. What is the duty they had to her once she's an 18-year-old, she signed the I-bond, she's sitting out in the waiting room? What is the duty they had to hold her longer? Your Honor, I think it's the same duty they would owe to anybody else. I mean, I don't think her age really makes that much of an impact. I think that if they see a person that they know is a danger to herself or to others, they have the right to detain that person. Is that a right or a duty? I want to say it's a duty, but then we're going to come back to the Marshall v. Ellison case, which says there's no private cause of action, which would at least, I think it at least leads to the impression that maybe it's not an affirmative obligation and it's just something that they can do. But I think it goes back to the fact that that's a public policy pronouncement by our legislature that we need to protect the public from intoxicated people as well as protect them from themselves. So you're saying a municipality has a duty to hold an intoxicated person until they're sober or else personally transport them or assure some kind of safe transportation? Is that what you're saying? I think so. I think that's what we want. That's what our police officers should do. We're not asking for there to be unlimited duties on what they do, but we as a society, that's the least we should be able to expect. Well, Mr. Prince, then where do you, in the facts of this case, where do you find the willful and wanton conduct? I mean, the officer put her in the lobby and said, I'll stay here, and he had his responsibilities to go back to answer a phone. Where is the willful and wanton conduct? He placed her there. Well, I think if we look at all the facts, she was arrested and charged with underage consumption. She had a .18 blood alcohol content. He admitted that she was intoxicated. But should he have had someone else there to make sure she didn't leave? I mean, what responsibility did he have? Should he have kept her in the lockup waiting for somebody to come in? I think definitely yes. Even after she's released? Even after that I-bond. I think that I did not find any constitutional authority requiring that release after the I-bond. Just like I did not find any authority addressing the timing of the I-bond or when they have to let somebody go from their custody, even if she has $100. I mean, are they going to let her go? Even if she pulls $100, are they going to let her go? Are we going to allow this to happen, to let her go? And she goes and puts a key in the car and drives away? I mean, unless we're talking about Ozick and Fadigado situations, I don't think that's the policy we want to- that there was a right to post-bond in this case. And the officer has to allow her to leave, right? But then you're saying that on top of that, the officer-she has a right to leave, and yet the officer has a duty to keep her. I mean, isn't there going to be a tension between that and a civil rights violation or a constitutional deprivation situation? I mean, can you see we're in a different fact pattern? That same person that wasn't allowed to release is going to say that he or she was unlawfully held? Without a doubt, I could see that happening. But we've got to look at what Officer Laird did. He conditioned her release on her waiting for an adult to come get her. So what we've been talking about shows that he has the authority, or at least he recognized or he thought he had the authority to impose conditions. It's not an absolute right to release. Otherwise, he knew she was a danger. Counsel, I'm sorry. We're all making jumps in the facts, I think. The officer, it seems to me, arguably, used the threat just to keep her there. He understood she could just leave, but he had to be about his business elsewhere, and he said, no, you stay here and wait and hope that that would do it for her. But it didn't. And that brings me back to the question that Justice Burke asked. What's willful and wanton about what the police officer did here? I think if you look at the entire circumstance with the way the whole evening played out in the Heron Police Department, I think it's a question of fact for the jury to determine whether there's willful and wanton. I understand that we, as a matter of law, can make the initial determination. But I just think that the way it all played out, I mean, he had her arrested. She blew a .18. She was two and a quarter times the legal limit. He told her to stay put. He knew that she was a danger to herself, both before and at the time of the arrest and at the time of the alleged release. The way he let her go into a public area unattended, left her unsupervised, even though he knew that it was likely she wasn't going to listen to what he said. Did the affidavits indicate whether there was anybody else in the lockup or what the lockup space was? Not to my knowledge. And just like in the lobby, I don't think the question had been asked, and I don't think the affidavit stated whether there was anybody else in the lobby. I think both Officer Laird and Officer Murrah both responded to this other call that came in, leaving only the dispatcher at the police station. That's what it sounded like. To the best of my knowledge, Your Honor, given where we were with Discover. More and more like the rock and the hard place that Justice Thomas talked about. Granted, but it's a situation though to where, again, and I understand what you're saying, but using that as a threat, but the fact of the matter is that's what he did because he knew something else needed to be done. And I think the fact that he left her unattended, knowing that she was likely to wander off, that could lead a jury to determine that there was willful and wanton misconduct. Getting back to Ozick and Faticado just for a second, isn't the real distinguishing factor there that the police authorized those individuals to commit a crime that is driving while under the influence when they said go ahead and drive away right after having given one of them a DUI ticket? Well, I think that, in fact, is what happened, Your Honor. Doesn't that distinguish that from this case? I think it does in the sense that the people that were allowed to leave committed another crime, and Chelsea, in our case, did not. She was the victim of being hit. But the police told them to get into the car and drive away. Yes, correct. I agree. Would there be immunity under 102 as well, failure to provide adequate police protection or service? I mean, we've been focusing on 107, the release from custody, even if we were to find that there was some greater duty that needed to be provided, and he failed to provide it. You know, knowing that he had to release her, but he had this duty to watch her get into somebody else's car, that's a failure to provide police protection or service, right, police service. Wouldn't that likewise be immunized? I think that that section goes more to like what we saw in DeSmet and perhaps even in Doe and Lacey where there was no response at all. As this court pointed out in DeSmet, it's a fact-specific application, and the three main facts you look at is number one, was there a response? And in a lot of these cases where you're talking about 4102 application, there's just no response by the police officers, whether it's to a motorist that's ran off the road or whether it's in Lacey where the officers for two months don't do anything. I would agree with this, though. 4102 or 4107, I mean, there have been cases that arise, and this case is one of them, where the results are tragic, but the language of the Tort Immunity Act somehow leaves open tragic results and yet immunizes entities. Tort Immunity Act has left many tragedies in its wake over the years, so I agree with that. I don't like it, but that's the fact of the matter. You're right. And you would also agree that that's at least the language. I know we have to apply it, but the Tort Immunity Act really is in the hands of the legislature. It is. But as a final note, I would also point out that if the court finds that 4102 or 4107 has any application to this case, then you've still got to look at 2202 as an exception to those blanket immunities contained in 4102 and 4107, the Wolf and Wanton language. Thank you. For the reasons we've discussed, I'm asking that you affirm the decision of the Fifth District Appellate Court. Thank you. Mr. Blyer. I tend to be brief. To answer Judge Thomas's first question, I don't know if it's specifically in the record, but the I-bond was issued. As a matter of fact, when Mr. Laird's deposition was taken, we had the I-bond that was issued there, and I can't remember without looking at the record whether it was mentioned during the deposition. Briefly, I think that 107 applies. There is no negligent release and there is no Wolf and Wanton conduct for releasing from custody. 107 applies. This young lady, while tragic, she was allowed to postpone. She was of age. She was released past the locked door of the police department into the lobby and then subsequently left. And I think it's important to note that at the time of this incident, the police officer was not exerting any control over the situation or at the timing. And also, in response to the two first district cases, both the Smed and Lacey were subsequent to the Orzek and the Fontagago case. And in closing, unless there's any other questions, it's our position that 107 in this particular case provides immunity. It's an absolute immunity. There's no Wolf and Wanton or negligence exception, and we ask that you reverse the fifth district. Thank you, Your Honor. Thank you, counsels. Case number 107658 will be taken up.